UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DERRICK HAMILTON,

            Petitioner,

    -against-

VINCENT HERBERT, Superintendent,
Attica Correctional Facility,

            Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM AND ORDER**
01 CV 1703 (JG)

A P P E A R A N C E S:

    DERRICK HAMILTON
        Reg. No. 93A5631
        Attica Correctional Facility
        P.O. Box 149
        Attica, New York 14011-0149
        Petitioner Pro Se

    CHARLES J. HYNES, ESQ.
        District Attorney
        Kings County
        350 Jay Street
        Brooklyn, New York 11201-2908
    By:  Adam S. Charnoff, Esq.
        Assistant District Attorney
        Attorneys for Respondent

JOHN GLEESON, United States District Judge:

      Petitioner Derrick Hamilton seeks habeas corpus relief from a judgment of

conviction entered after a jury trial in state court. I held oral argument by telephone conference

on December 19, 2003. For the reasons set forth below, the petition is denied.

## BACKGROUND

On January 4, 1991, at approximately 11:00 in the morning, Hamilton shot and killed Nathaniel Cash in the vestibule of 215 Monroe Street, Brooklyn, while three other men surrounded Cash. The murder was witnessed by Cash's girlfriend, Jewel Smith, who was well-acquainted with Hamilton from the neighborhood. For these acts, Hamilton was charged with murder in the second degree, and criminal possession of a weapon in the second and third degrees. On June 17, 1992, a jury found Hamilton guilty of second-degree murder and second-degree criminal possession of a weapon.

In a pro se motion to set aside the verdict pursuant to New York Criminal Procedure Law section 330.30, Hamilton claimed, inter alia, that a new trial was required based on newly discovered evidence of his innocence. He based this claim on Smith's sworn recantation, to his private investigator, Robert Holt, of her trial testimony. In her recantation, Smith claimed that the police and prosecutor had threatened her into testifying at trial. Hamilton's newly discovered evidence claim was also based on two other alleged recantations by Smith, and evidence placing Smith at a location other than that of the murder at the time of the shooting. Hamilton also claimed that the prosecutor misled him and his attorney into believing that one "Karen Smith"—from whom a statement had been taken by an officer at the scene (that was later disclosed to defense counsel) that she had not witnessed the murder—was someone other than Jewel Smith, in violation of Brady. Finally, Hamilton claimed ineffective assistance of trial counsel based on his lawyer's failure to cross-examine Smith on the statement she made as "Karen Smith," described above, and based on counsel's cross-examination of government-

2

witness Detective Louis Scarcella. During Scarcella's cross-examination, defense counsel opened the door to testimony regarding Hamilton's threats against Smith.[1]

During the ensuing 12 months, the trial court entertained a variety of motion papers, memoranda of law, letters, and affidavits pertaining to Hamilton's original section 330.30 motion. In addition, the court held extensive hearings on several dates between October 19, 1992, and June 10, 1993, at which Hamilton was present and represented by counsel. (See Resp. Ex. D.) At these hearings, Smith testified that police officers and prosecutors threatened to put her in jail for murder and take her children away from her after she expressed reluctance to testify against Hamilton. According to Smith, she testified falsely against Hamilton both in the grand jury and at trial because of those threats. Smith also claimed to have informed the prosecutor, prior to Hamilton's trial, that her trial testimony implicating Hamilton would be false. Two other defense witnesses, Holt and Michael Ross, corroborated Smith's allegations regarding her recantation. Another defense witness, Felicia Schuler, testified that she had seen Smith at a grocery store when Cash was murdered.

Smith's hearing testimony was contradicted, however, by the prosecutor at trial, Anne Gutmann, Detective Investigator Joseph Ponzi, and Detectives Frank DeLouisa and Scarcella, all of whom testified that no one had threatened Smith, and that Smith's reluctance to testify against Hamilton was due to her overwhelming fear of him. In a decision dated July 8, 1993, the trial court denied Hamilton's motion in all respects. (See Resp. Ex. E.) As to Hamilton's ineffective assistance of counsel claim, the court held:

---

[1]     The claims described in this paragraph are contained in the various papers Hamilton submitted as part of his section 330.30 motion, and are collected in respondent's Exhibit B.

In this case all defendant has demonstrated is that defense counsel did not cross-examine Jewel Smith regarding her statement that she was at the store when the shooting occurred. Instead, [defense counsel] cross-examined Ms. Smith regarding her signed sworn statement that she saw the shooting but Hamilton was not involved. Additionally, defense counsel asked Detective Scarcella questions which allowed him to relate alleged threats made by defendant to Ms. Smith. The court will not speculate into the trial strategy of defense counsel.

Applying this standard and upon examining the trial record, including the extensive cross-examination of Jewel Smith by defense counsel and considering the totality of the facts and circumstances in this case, the court concludes that defendant received "meaningful representation."

(Id. at 13.) As to the newly discovered evidence, the court concluded: "Upon observing the witnesses and the defendant during the hearing and trial, the court finds that all the evidence and facts surrounding and supporting the recantation by Jewel Smith to be suspect and unreliable. . . . Similarly, this Court rejects defendant's 'newly discovered evidence' as being contrived and not believable." (Id. at 15-16.) On July 12, 1993, the court sentenced Hamilton as a second felony offender to a term of 25 years to life for the murder charge.

By motion dated January 5, 1994, Hamilton, acting pro se, moved to vacate his judgment of conviction pursuant to New York Criminal Procedure Law section 440.10, claiming that the government committed numerous Rosario and Brady violations at trial, and ineffective assistance of counsel. Specifically, Hamilton claimed that the government violated his Brady rights by failing to disclose (1) that an alleged witness, Taseem Douglas, had tried to inform law enforcement authorities that Hamilton had not been present at the time of the shooting, and (2) that an agreement existed that exempted Smith from prosecution while she was in New York to testify at Hamilton's trial pursuant to a material witness order. Hamilton also claimed that the government violated his Rosario rights by withholding recorded pretrial statements, including

4

comments made by Smith at a material witness hearing in North Carolina, and ex parte, sealed discussions between the prosecutor and the trial court prior to trial. Finally, Hamilton raised myriad ineffective assistance of counsel claims. (See Resp. Ex. L.)[2]

The court granted Hamilton's motion on June 16, 1995, to the extent that it ordered a hearing to determine the validity of one of his Brady claims; namely, that the government failed to disclose that Douglas had witnessed the murder, did not see Hamilton at the scene, and tried to communicate this information to the government. The court denied the remainder of Hamilton's claims, stating:

> Defendant's first claim that the North Carolina transcript is Rosario material is erroneous. The transcript of Jewel Smith's material witness hearing contains no references to the subject matter of her trial testimony. Moreover, these previously untranscribed Minutes of a proceeding conducted in an out-of-state jurisdiction were never in the prosecution's possession or control and are therefore not Rosario material.
>
> This lack of possession or control is also what makes defendant's second Rosario claim fail. Defendant claims that the failure to turn over the Medical Examiner's autopsy tape violates Rosario. This claim was rejected by our Appellate Division in People v. Washington.
>
> Finally, defendant's claim that the audio tape of Jewel Smith's interview by Assistant District Attorney Luzio was not turned over is contradicted by the trial transcript, which reveals that defense counsel made direct reference to that interview during his cross-examination.
>
> . . . .

---

[2]   By papers dated October 3, 1994, Hamilton moved to unseal minutes of pretrial in camera discussions that took place between the trial court and prosecutor on March 17 and April 16, 1992. (The sealed minutes concerned the government's requests for adjournments to draft a cooperation agreement with a potential witness, Darren Breeden, who was in jail awaiting trial on three separate homicides. Breeden claimed to have overheard Hamilton boasting about Cash's murder. Immediately prior to trial, however, Breeden refused to testify, fearing his and his family's safety.) Hamilton claimed to need these minutes to perfect his direct appeal. (See Resp. Ex. U.) The trial court unsealed the April 16, 1992, transcript, but it was discovered that the March 17, 1992, stenographic notes had been lost. The court conducted a reconstruction hearing on June 11, 1997, regarding the March 17, 1992, discussion, at which the trial prosecutor submitted an affirmation detailing her recollection of the conversation. Meanwhile, Hamilton moved for a writ of error coram nobis, or, in the alternative, for summary reversal of his conviction, on the ground that he could not perfect his direct appeal without the March 17, 1992, transcript. (See Resp. Ex. X.) This motion was denied by the Appellate Division on July 15, 1997. (Resp. Ex. Y.)

Defendant's other Brady claim that Jewel Smith gave exculpatory statements to the authorities in North Carolina is totally without factual merit in that the transcript submitted by defendant contains no substantive statements by Jewel Smith concerning the January 3, 1991 shooting.

Similarly defendant's final claimed Brady violations involving the failure to reveal alleged benefits received by Jewel Smith as a CPL § 640.10 material witness does [sic] not require a new trial. Initially, defendant does not submit any statement from his attorney stating that this information was never revealed to him. In fact, the District Attorney claims that redacted versions were turned over. Additionally, the District Attorney claims references to this adjudication were made on the record. Moreover, these allegations, which include lodging, benefits and meals while Jewel Smith was adjudged a "material witness," are not benefits given to induce her testimony nor are they facts which could be used for impeachment purposes. Thus, this is not "Brady" material. Additionally, had this information been revealed, it would not have warranted a different result. In fact, had the jury known about the Material Witness Order it might have bolstered the District Attorney's claim that Jewel Smith was afraid of the defendant. Reversal based upon this claim is therefore denied.

Defendant's final claim is that of ineffective assistance of counsel. Many of defendant's complaints were previously raised in defendant's CPL § 330 motion, which was denied by this Court by Order dated July 8, 1993. These complaints, however, regarding his attorney's representation during trial do not require reversal of the conviction.

. . . .

The court notes that many of defendant's claims herein are belied by the court record, including the statement by his attorney of the unavailability of certain witnesses whom the defendant claims his attorney did not contact or call on defendant's behalf.

Moreover . . . the court concludes that under the totality of the circumstances the defendant received "meaningful representation."

(Resp. Ex. N at 4-8 (citations omitted).)

The court held hearings on Hamilton's motion throughout the summer and into the fall of 1995, during which Douglas testified that he had told detectives on two occasions—once in his home and once while incarcerated in Connecticut—that Douglas was at the scene of the murder, and that Hamilton was not present when Cash was shot. Douglas's testimony was contradicted by that of his mother, who testified that she had been present when

Douglas was interviewed at home by detectives, and Douglas told the detectives that he had not been at the scene of the murder. As to the other occasion—in the Connecticut jail—he was contradicted by his former defense attorney in another case, Detective Scarcella, and a lieutenant of the New Haven Police Department. All three testified that Douglas refused to talk about Cash's murder.[3] (See Resp. Ex. O.)

> On April 2, 1996, the court denied Hamilton's motion in its entirety, finding:
>
> Douglas has not proven to be a reliable witness. His testimony is filled with many inconsistencies and is contradictory to all the reliable evidence. He stated first that he told the police the same story at all times. After the testimony of his mother, Douglas then claimed he told two stories, one in the presence of his mother, the other in her absence. Furthermore, Douglas states that he spoke with Detective Scarcella prior to his meeting with Scarcella, Ms. Merkin, and Detective White. This is contrary to the testimony of all other witnesses . . . . Thus, this Court finds the "newly discovered evidence" lacking credibility and insufficient proof that the prosecution was in possession of this exculpatory evidence.

(Resp. Ex. R at 4-5.) On June 14, 1996, the Appellate Division granted Hamilton leave to appeal the hearing court's denial of his section 440.10 motion. (Resp. Ex. S.) Subsequently, the Appellate Division granted Hamilton's motion to consolidate his direct appeal with his appeal from the denial of the section 440.10 motion. (See Resp. Ex. T.)

By application dated March 14, 1997, while Hamilton still had a coram nobis motion pending in the Appellate Division, see supra note 2, Hamilton petitioned this Court for a writ of habeas corpus, claiming that he was (1) denied the right to appeal as a result of the

---

[3]     During the evidentiary hearing, Hamilton, through retained counsel, moved to expand the scope of the hearing to include the testimony of two allegedly newly discovered alibi witnesses who did not testify at trial and who were not mentioned in Hamilton's pretrial notice of alibi. (See Resp. Ex. P.) The hearing court denied the motion on the record because (1) Hamilton's alibi list failed to include these two witnesses, even though according to defense counsel they were known to Hamilton prior to trial, and (2) Hamilton did not fulfill the due diligence requirements of newly discovered evidence under New York law, as he offered only "broad generalities" as to why the witnesses could not have been located. (Resp. Ex. R at 5-6.)

missing transcript and the refusal of appellate counsel to perfect his appeal, (2) deprived of his due process and equal protection rights to a speedy trial, (3) denied effective assistance of appellate counsel, and (4) arrested on the basis of the false, coerced statement of Jewel Smith, in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. (See Resp. Ex. AA.) I dismissed this petition on December 9, 1997, on the ground that Hamilton had failed to exhaust his available state remedies. (Resp. Ex. CC.) I also noted that most of the delay in perfecting Hamilton's direct appeal was attributable to the extensive postconviction litigation initiated by Hamilton at the trial court level. (Id. at 5.) The Second Circuit denied Hamilton's motion for a certificate of appealability on February 8, 1999. (Resp. Ex. DD.)

By pro se motion dated September 3, 1998, Hamilton again moved to vacate his conviction pursuant to section 440.10. Hamilton raised new Brady and newly discovered evidence claims, including allegations that Darren Breeden, see supra note 2, had informed law enforcement officers prior to Hamilton's trial that Hamilton was not responsible for Cash's murder.[4] According to Breeden's affidavit, a dead person, Money Will Dawson, had killed Cash and spread the false rumor that Hamilton was responsible. Breeden stated that he tried to communicate this information to the government, but the prosecutor suppressed the information and tried to coerce him to testify falsely against Hamilton. Hamilton's second section 440.10 motion was also based on the improper ex parte discussions between the prosecutor and the trial court prior to trial; discussions Hamilton claimed deprived him of the effective assistance of

---

[4]     As set forth in note 2, supra, this is the same Breeden who had overheard Hamilton boasting about Cash's murder and who was supposed to testify at Hamilton's trial for the government. However, the court unsealed the in camera discussions, and thereby revealed Breeden's existence as a potential government witness, before ascertaining that Breeden and Hamilton were incarcerated in the same facility. Perhaps more than coincidently, Breeden thereafter disavowed his initial cooperation with the government and instead claimed that he had actually attempted to exculpate Hamilton prior to trial.

8

counsel. Hamilton also moved for the court to recuse itself on the basis that, because one of his claims involved court misconduct, the court was a necessary witness. Finally, Hamilton moved to set aside his sentence, specifying no grounds for doing so.[5] (See Resp. Ex. GG.)

In a July 20, 1999, decision, the trial court granted Hamilton's second section 440.10 motion to the extent of ordering a hearing to determine the validity of his Brady claim regarding Breeden.[6] The court denied Hamilton's other claims.[7] As to recusal, the court stated:

> Defendant has failed to state a basis for his assertion that the court committed improper conduct. All ex parte in camera proceedings occurred on the record. There was no discussion of any substantive matter concerning the trial during any of the conferences involving Darren Breeden or Jewel Smith. . . . [Hamilton] has failed to show that he was excluded from a material stage of his trial.

(Resp. Ex. II at 9-10.) As to the ex parte conversations, the court found:

> The Assistant District Attorney stated on the record the basis for her requests for adjournments concerning Mr. Breeden, i.e., that she was attempting to arrange for him to testify under the terms of a cooperation agreement. The agreement was not finalized and Mr. Breeden did not testify at trial.
> The court also discussed ex parte, and on the record, the Assistant District Attorney's requests for adjournments so as to arrange for Ms. Smith's testimony as a material witness. Since there was no discussion of substantive matters when the adjournments were requested, defendant had no right to be present for these discussions.

(Id. at 13.) The court recast Hamilton's ineffective assistance of counsel claims as a claim of newly discovered evidence and an allegation that the failure of the court to disclose the in camera

---

[5] While his second section 440.10 motion was pending, Hamilton filed his second habeas petition in this Court, dated April 20, 1999, repeating the same claims alleged in his first petition. (See Resp. Ex. EE.) On July 7, 1999, however, I granted Hamilton's request to withdraw this second petition. (Resp. Ex. FF.)

[6] The court also appointed counsel to represent Hamilton at the hearing.

[7] The Appellate Division denied Hamilton leave to appeal the denial of these other claims on October 28, 1999. (Resp. Ex. JJ.)

transcripts violated Hamilton's due process rights to a fair trial. As to the newly discovered evidence claim, the court wrote:

> In the Breeden affidavit, the court finds that the proposed testimony of Mr. Breeden in which Money Will stated that defendant did not commit the murder would not be cumulative to testimony that was presented at defendant's trial.
>
> The recantation by Jewel Smith is not newly discovered evidence and would be cumulative because she has recanted her testimony several times, both before and after trial and at the hearing on defendant's motion to set aside the verdict. The court finds that the proposed testimony of Mr. Breeden about his conversation with Money Will would not have been merely impeaching or contradicting former evidence. . . .
>
> Testimony from Mr. Breeden about Ms. Smith's statement that she did not witness the shooting would merely impeach or contradict her testimony at trial.

(Id. at 16-17 (citation omitted).)

At the hearing, Breeden testified that Money Will Dawson had informed him shortly after Cash's murder that Dawson had killed Cash. Moreover, according to Breeden, Dawson indicated that he was attempting to spread the false rumor that Hamilton was responsible for killing Cash. Breeden testified that he had tried to communicate this exculpatory information to the government during debriefings, but that he was threatened and bribed with favorable plea deals to testify against Hamilton. Two detectives and two Assistant District Attorneys denied Breeden's assertions, testifying that the government had no knowledge that Breeden had any information on the Cash murder until Breeden told them that Hamilton had confessed in his presence. Until then, Breeden had been debriefed only regarding murders that either he or his drug organization had committed. (See Resp. Ex. KK.)

At the same time that these hearings were being conducted, Hamilton, through retained counsel, filed a brief in the Appellate Division on August 27, 1999, alleging (1) that the

10

government committed numerous <u>Rosario</u> violations, (2) that the government knowingly withheld exculpatory information, in violation of <u>Brady</u>, (3) ineffective assistance of trial counsel, and (4) that the trial court denied him a fair trial by improperly marshaling the evidence, making prejudicial comments, instructing the jury erroneously, and allowing a material stage of the trial to proceed in Hamilton's absence. (<u>See</u> Resp. Ex. F.) In a pro se supplemental brief filed in the Appellate Division on September 10, 1999, Hamilton additionally claimed that the trial court (1) denied him a fair trial by conducting several in camera discussions with the prosecutor regarding Smith and Breeden, (2) erroneously denied his section 330.30 motion, and (3) erroneously denied his first section 440.10 motion. (<u>See</u> Resp. Ex. H.)

On May 22, 2000, the Appellate Division, Second Department, unanimously affirmed Hamilton's judgment of conviction:

> The defendant's claim that a detective's notebook was not disclosed to his attorney in a timely manner is belied by the record. The defendant concedes that a *Rosario* packet, which included the detective's notebook, was turned over to his attorney during jury selection. There was no *Rosario* violation since the People furnished the defendant with a copy of the notebook well before the time prescribed by CPL 240.45(1)(a).
>
> The defendant also contends that he was prejudiced at trial because sealed transcripts of ex parte discussions between the trial court and the prosecutor were not turned over to him. However, the defendant concedes that the ex parte discussions pertained to efforts which were being made by the People to procure the appearance of the sole eyewitness at the trial. "Neither the defendant nor the prosecution is entitled to notice of an application for a material witness hearing, and neither party has standing to contest or to participate in a hearing on an application made by the other."
>
> The defendant was not denied the effective assistance of counsel because his attorney failed to call certain witnesses. At the time of trial, the alleged witnesses were unavailable or unknown to both the defendant and his attorney. Additionally, the defense counsel informed the court that one alibi witness was ill, resided in Connecticut and that "travelling [sic] [to court] would be impossible." The defense counsel further advised the court that another alibi witness was too frightened and had failed to appear

11

in court even though on the previous evening he had agreed to appear. The defense counsel's request for a continuance so he could attempt to persuade this witness to appear was denied. Counsel cannot be considered ineffective because alibi witnesses were too ill to come to court to testify or were unwilling to testify.

The defendant's claim that the People violated their obligation to disclose the existence of exculpatory material is also meritless, since the existence of the claimed exculpatory material was known, or should have been known, to the defendant.

The defendant's remaining contentions, including those raised in his supplemental *pro se* brief, are either unpreserved for appellate review or are without merit.

People v. Hamilton, 708 N.Y.S.2d 136, 136 (2d Dep't 2000) (citations omitted) (second alteration in original). On November 20. 2000, the Court of Appeals denied Hamilton's application for leave to appeal. People v. Hamilton, 95 N.Y.2d 935 (2000) (Ciparick, J.).

While Hamilton awaited the trial court's decision on his second section 440.10 motion, he filed a third section 440.10 motion, dated June 2, 2000. Hamilton claimed that the government violated his Rosario rights by failing to disclose Detective Investigator Ponzi's handwritten notes of an interview he had conducted with one Richard Bush, wherein Bush claimed to have been told by Smith that Smith had witnessed Cash's murder and that Dawson was there. Hamilton also claimed ineffective assistance of trial counsel based on his attorney's alleged failure to call Kim Freeman and Hamilton's brother, James Hamilton, as alibi witnesses. Hamilton also claimed that Freeman's and Hamilton's alibi testimony constituted newly discovered evidence. (See Resp. Ex. NN.) Earlier, on November 17, 1999, Hamilton had moved to set aside his sentence pursuant to New York Criminal Procedure Law section 440.20, claiming that the nondisclosure of the sealed transcripts of the in camera discussions between the trial court and the prosecutor rendered his sentence illegal. (See Resp. Ex. NN.) Hamilton reiterated this claim in his June 2, 2000, section 440.10 motion.

12

On November 22, 2000, the trial court denied Hamilton's <u>Brady</u> claim regarding

Breeden, on which the court had held an evidentiary hearing, as discussed above, and denied

Hamilton's third section 440.10 motion:

> The court finds that the testimony of Joseph Ponzi, Dan Saunders, and Anne Gutmann was credible. The court finds that the testimony of Darren Breeden was incredible because of his demeanor in the answering of questions and the inconsistencies in his answers.
>
> . . . .
>
> Detective Ponzi testified that he met with Richard Bush on September 11, 1991 in the Brooklyn District Attorney's office. He wrote the following statement made by Richard Bush in his notebook:
> "Derrick Hamilton. Jewel came to visit Bush.
> Money Will was there. Money Will is dead now."
>
> . . . .
>
> Since neither Bush nor Ponzi testified at trial, then the above is not a statement of a witness.

(Resp. Ex. PP at 4, 6.) As to Hamilton's ineffective assistance of counsel claim, the court held

that it was procedurally barred because Hamilton had raised it on direct appeal. (<u>Id.</u> at 7.)

Hamilton's motion to set aside his sentence was also procedurally barred, as the grounds for that

motion had also been decided by the Appellate Division. <u>See Hamilton</u>, 708 N.Y.S.2d at 136.

Finally as to the alibi evidence, the court held:

> The testimony of Kim Freeman and James Hamilton is not new evidence within the meaning of the statute since they were known to defendant and were listed as witnesses on the alibi notice. They could have been subpoenaed to testify at the trial.
>
> [Hamilton's brother] testified at the hearing that he did not see defendant in the morning on January 4, 1991, the day of the murder. He saw defendant at a party in New Haven, Connecticut in the evening of that day.
>
> Defendant has failed to meet his . . . burden of showing that the proffered evidence was in fact newly discovered, i.e., that it was not discovered until after trial and could not have been discovered before trial with the exercise of due diligence, and is sufficiently probative to likely change the result if a new trial is granted.

13

(Resp. Ex. PP at 9.) On February 7, 2001, the Appellate Division denied Hamilton leave to appeal the trial court's denial of the remainder of his second section 440.10 motion, as well as the denial of his third section 440.10 motion.

In his petition for habeas relief dated March 16, 2001, before me now, Hamilton claims (1) ineffective assistance of trial counsel, due to prosecutorial and judicial interference, and lack of pretrial investigation and preparation; (2) that the government knowingly elicited perjured testimony from Smith at Hamilton's trial, and suppressed Smith's exculpatory statement in violation of Brady; (3) that the trial court erroneously denied Hamilton's section 400.10 motions based on newly discovered evidence, (4) that his constitutional right to be present at a material stage of his trial when the trial court ordered a read-back of testimony and delivered a supplemental charge to the jury in Hamilton's absence, (5) that the trial court violated Hamilton's right to appeal by belatedly unsealing the transcripts of the pretrial ex parte discussions between the trial prosecutor and the trial court; and (6) that the trial court's consciousness of guilt charge violated Hamilton's right to a fair trial.

## DISCUSSION

A.    The Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") has narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Under the AEDPA standard, which applies to habeas petitions filed after AEDPA's enactment in 1996, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

14

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); see also Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" Wiggins v. Smith, 123 S. Ct. 2527, 2535 (2003) (quoting Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1175 (2003)).

Under the latter standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Gilchrist, 260 F.3d at 93 (citing Williams, 529 U.S. at 411); see also Yarborough v. Gentry, 124 S. Ct. 1, 4 (2003) (per curiam) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but

15

objectively unreasonable."); Wiggins, 123 S. Ct. at 2535 (same). Interpreting Williams, the

Second Circuit has added that although "[s]ome increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise, habeas relief would be limited to state

court decisions so far off the mark as to suggest judicial incompetence." Gilchrist, 260 F.3d at

93 (citing Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

   This standard of review applies whenever the state court has adjudicated the

federal claim on the merits, regardless of whether it has alluded to federal law in its decision. As

the Second Circuit stated in Sellan v. Kuhlman:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state
> prisoner's federal claim on the merits when it (1) disposes of the claim "on
> the merits," and (2) reduces its disposition to judgment. When a state
> court does so, a federal habeas court must defer in the manner prescribed
> by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal
> claim—even if the state court does not explicitly refer to either the federal
> claim or to relevant federal case law.

261 F.3d 303, 312 (2d Cir. 2001).

   In addition, a state court's determination of a factual issue is presumed to be

correct, and is unreasonable only where the petitioner meets the burden of "rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

> However, "even in the context of federal habeas, deference does not imply
> abandonment or abdication of judicial review . . . . A federal court can
> disagree with a state court's credibility determination and, when guided by
> AEDPA, conclude the decision was unreasonable or that the factual
> premise was incorrect by clear and convincing evidence."

Shabazz v. Artuz, 336 F.3d 154, 161 (2d Cir. 2003) (ellipsis in original) (quoting Miller-El v.

Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1041 (2003)).

B.  Hamilton's Claims

   1.  Ineffective Assistance of Counsel

       The Supreme Court has established the following standard for ineffective

assistance claims:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction . . . resulted from a breakdown in the
> adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  Thus, to make out this type of claim, the

petitioner must demonstrate both (1) that his attorney's performance "fell below an objective

standard of reasonableness," id. at 688, and (2) that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," id. at

694.  In assessing the reasonableness of counsel's performance, "judicial scrutiny of counsel's

performance must be highly deferential," and the court must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation marks

omitted); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998); see also Yarborough v. Gentry,

124 S. Ct. 1, 4 (2003) (per curiam) ("[C]ounsel has wide latitude in deciding how best to

represent a client . . . .").

In assessing counsel's performance, I "must conduct an objective review . . . measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Wiggins v. Smith, 123 S. Ct. 2527, 2535 (2003) (citations omitted) (quoting Strickland, 466 U.S. at 688-89)). The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct" and has instead emphasized that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Id. at 2535 (quoting Strickland, 466 U.S. at 688).

To establish the requisite effect of counsel's performance on the outcome of the proceeding, it is not sufficient if the petitioner shows merely that counsel's errors had "some conceivable effect" on the outcome. Strickland, 466 U.S. at 693. Rather, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight. See Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

      a.    Failure to Prepare and Investigate

Hamilton alleges that counsel failed to investigate who "Karen Smith" was, in part because the prosecution informed counsel that "Karen Smith" was someone other than Jewel Smith. After Cash's murder, Jewel Smith gave a statement to Detective DeLouisa, under the pseudonym "Karen Smith," in which she claimed to have been inside a store when Cash was killed. The trial court found that Hamilton told his attorney that Karen Smith and Jewel Smith

were the same person (Resp. Ex. E at 10), and that DeLouisa's memobook entry containing Smith's statement was turned over to the defense prior to jury selection (id. at 11.) Further, there was a notation on the memobook entry reading "Jewel." (Id. at 10.) The trial court, in finding that defense counsel provided meaningful representation, wrote:

> In this case all defendant has demonstrated is that defense counsel did not cross-examine Jewel Smith regarding her statement that she was at the store when the shooting occurred. Instead, Mr. Sheinberg cross-examined Ms. Smith regarding her signed sworn statement that she saw the shooting but Hamilton was not involved. Additionally, defense counsel asked Detective Scarcella questions which allowed him to relate alleged threats made by defendant to Ms. Smith. The court will not speculate into the trial strategy of defense counsel.

(Id. at 13.) Indeed, it was entirely reasonable for defense counsel to believe that cross-examining Smith based on her signed, sworn statement that Hamilton was not at the scene was more powerful than cross-examining Smith with her statement to the police that she saw nothing. Furthermore, as these two pretrial statements of Smith were inconsistent with each other, it was reasonable for counsel to ignore her statement to DeLouisa, which, though it would have undermined her trial testimony, would also have undermined the power of her signed, sworn statement that Hamilton was not the shooter. Further, as the trial court found that defense counsel in fact knew that Karen Smith was Jewel Smith, Hamilton's claim that his attorney was ineffective for failing to investigate this link is groundless.[8]

Hamilton also argues that his attorney should have further investigated Taseem Douglas. After a hearing, the trial court denied Hamilton's first section 440.10 motion based on newly discovered evidence; specifically, Douglas's testimony:

---

[8]     For these reasons, Hamilton's seventh ground for relief—that the government's allegedly untimely disclosure of the "Karen Smith" statement deprived him of due process and a fair trial—submitted in a June 20, 2001, supplement to his petition, is also meritless.

> Douglas has not proven to be a reliable witness. His testimony is filled
> with many inconsistencies and is contradictory to all the reliable evidence.
> He stated first that he told the police the same story at all times. After the
> testimony of his mother, Douglas then claimed he told two stories, one in
> the presence of his mother, the other in her absence. Furthermore,
> Douglas states that he spoke with Detective Scarcella prior to his meeting
> with Scarcella, Ms. Merkin, and Detective White. This is contrary to the
> testimony of all other witnesses . . . . Thus, this Court finds the "newly
> discovered evidence" lacking credibility and insufficient proof that the
> prosecution was in possession of this exculpatory evidence.

(Resp. Ex. R at 4-5.) Because Douglas's testimony was unreliable, inconsistent, and

contradictory to all the reliable evidence, Hamilton's attorney was reasonable in choosing not to

waste valuable time investigating Douglas, and not to put him on the stand.

    b.    Judicial and Prosecutorial Interference with the Right to Counsel

        Hamilton contends that the trial court, by improperly sealing the transcripts of two

pretrial in camera discussions with the prosecutor, deprived him of meaningful representation.

By sealing the transcripts, Hamilton's argument goes, the court prevented him from learning that

Money Will Dawson had informed Breeden that Dawson had killed Cash and that Dawson

planned to spread the lie that Hamilton had committed the murder. Hamilton's claim is meritless

for several reasons.

        First, as described above, Breeden was originally trying to come to an agreement

with the prosecutor to inculpate Hamilton, by testifying that he had overheard Hamilton boasting

about the Cash murder. In his motion to withdraw his plea, Breeden stated, "In fulfilling this

agreement I would have to testify against Derek [sic] Hamilton who is a known murderer, me

testifying would leave my family at jepordy [sic], which threats have all ready been sent to my

family . . . ." (Resp. Ex. LL (Aff. in Supp. to Withdraw Plea ¶ 6).) At the hearing regarding

Breeden's "new" testimony about Dawson, the trial court found that "the testimony of Joseph

Ponzi, Dan Saunders, and Anne Gutmann was credible. The court finds that the testimony of Darren Breeden was incredible because of his demeanor in the answering of questions and the inconsistencies in his answers." (Resp. Ex. PP at 4.) In light of the incredible nature of Breeden's exculpatory testimony, and the fact that he was originally a prosecution witness, Hamilton's representation was not hampered by defense counsel's ignorance of Breeden.

Further, the conversations between the prosecutor and trial court involved scheduling matters; the prosecutor sought more time to draft a cooperation agreement for Breeden to testify against Hamilton, and to have Smith adjudicated a material witness. As discussed below, Hamilton had no right to be present at these proceedings, and his defense would have gained nothing by his being there.

     c.    <u>Opening the Door to Prejudicial Testimony</u>

Hamilton also claims that defense counsel, in the course of his cross-examination of Detective Scarcella, opened the door to testimony from Scarcella that Hamilton had threatened Smith:

Q    After January 4, 1991, did you ever interview Jewel Smith again?

A    Yes.

    . . . .

Q    She called you?

A    She beeped me, yes.

Q    When she called you, was it with reference to this case?

A    Certainly was.

Q    What did she tell you?

A    She stated to me that she cannot go to the Grand Jury and testify against Bush, meaning the defendant, "He will kill me and my whole family. My grandmother found out that Bush killed Nathaniel [Cash]. She knows him. What he'll do, he'll kill everyone. My grandmother knows Bush all his life, he's a killer," and she said she was going to leave New York City.

Q    Did you find out where she went when she left New York City? [Prosecutor objects to this question.]

(Tr. at 344-45.) Based at least in large degree on this exchange, the trial court decided to instruct the jury on consciousness of guilt:

THE COURT: I'm going to charge consciousness of guilt, based upon threats. If they believe that she was threatened, that would be a consciousness of guilt charge.

[DEFENSE]: I'm going to object to that.

THE COURT: On what grounds?

[DEFENSE]: There wasn't sufficient information.

THE COURT: You brought out there was up until your cross-examination.

[DEFENSE]: It still wasn't sufficient. It still wasn't sufficient information before this jury to have that particular charge.

THE COURT: It's your opinion. We're dealing in law, not opinions.
When she just testified to it herself, I wasn't prepared to do it, but then when you fortified it, it was pure hearsay, but you—there was no objection made, and you brought it out.
When you brought it out from the detective that she complained right up front, that she was threatened, that she was scared, and if they believe her testimony and that of the detective to whom she related it, that this defendant threatened her, that's a proper charge of consciousness of guilt.
I intend to give it . . . .

. . . .

22

[DEFENSE]: I don't see any threats that were made, Judge, by Mr. Hamilton. But, if you insist on charging—

THE COURT: You don't see any threats? She testified that he threatened her.

[DEFENSE]: She testified what she testified to.

THE COURT: That's credibility of witnesses. If they don't believe her, that's the end of it.

(Id. at 365-58.)

Prior to Scarcella's testimony, Smith had testified that she was afraid of Hamilton, and that she had sent love letters to him in prison and eventually recanted out of fear:

THE COURT: Why did you send [the love letters]?

THE WITNESS: Because these are things he wanted to hear from me.

. . . .

THE COURT: [H]e was in jail, you were home, or wherever you were, how did he compel you to write these letters, what forced you? How did he get you to do it?

THE WITNESS: Threats.

THE COURT: Threats. How were these threats conveyed to you, in letters?

THE WITNESS: And phone conversations.

THE COURT: Phone. And, these threats were such—he threatened you to send a letter? Did he say, write me a letter; is that what the threat was?

THE WITNESS: Keep in touch with him.

. . . .

23

THE WITNESS: He called me and then, I said I was shocked to hear his voice. I said "How did you find out my number?" He said, "How you think?" And then he said that he knows where I'm staying at, he can prove it . . . to me in a couple of days, you know, I will soon see.

THE COURT: And what happened in a couple of days?

THE WITNESS: Obviously, the letter.

. . . .

THE COURT: Then, you got this phone call from the woman whose name you don't know, who said she was calling on behalf of the defendant, and the defendant wants you to go to the lawyer's office and she told you what you were to do, sign a statement; is that right?

THE WITNESS: Yes.

. . . .

Q    Now, after you received this phone call, where did you go?

A    Down to [defense counsel's] office.

Q    Did anyone go with you?

A    Yes.

Q    Who?

A    The girl that told me she'll be coming within ten minutes to meet me in front of the house in a cab.

Q    Did you—after you hung up the telephone with the girl, where did you go?

A    To [defense counsel's] office.

Q    Did you go to the front of the building and meet the girl?

24

A       Yes.

Q       How did you get down to [defense counsel's] office?

A       In the cab.

Q       Who was in the cab with you?

A       The girl.

THE COURT:          How did you recognize this girl?

THE WITNESS:        Because she told me exactly what she was going to be wearing, you know.

THE COURT:          She gave no name at all?

THE WITNESS:        She told me what she was there for.

THE COURT:          What did she tell you?

THE WITNESS:        To take me down to his lawyer's office because, you know, I must have given a statement to the cops in order for him to get arrested.

Q       Did there come a time that you got to [defense counsel's] office?

A       Yes.

Q       And, did the girl come with you?

A       Yes.

Q       And, when you were speaking with [defense counsel], where was the girl?

A       Outside of his office sitting on a couch.

Q       Was anyone else in the room with you and [defense counsel]?

A       No.

Q       Was there a door to the office?

25

A    Yes.

Q    Was that door open or closed while you were speaking to [defense counsel]?

A    It was open.

Q    Could you see the girl through the door while you were speaking to [defense counsel]?

A    Yes.

Q    And, did she stay there the whole time you were with [defense counsel]?

A    Yes.

. . . .

Q    You told [defense counsel] what to write, did you?

A    Yes.

. . . .

Q    And, that was what the girl told you?

A    Yes.

Q    To say?

A    Yes.

. . . .

Q    And, when you left and walked out of his office, was the girl still there?

A    Yes.

. . . .

Q    Mrs. Smith, why did you sign that piece of paper in [defense counsel's] office?

A Because I didn't have any choice in the matter.

Q Why did you feel you didn't have any choice?

A Because, if I didn't comply, I knew that something would have happened to my brothers.

(Tr. at 207-08, 216, 233-37, 243.)

At the close of the evidence, the court instructed the jury on consciousness of

guilt:

> Another method of credibility that came up at this trial dealt with the concept of consciousness of guilt. It was the testimony of Jewel Smith that the reason she wrote the letters and the reason that she went to [defense counsel's] office to sign [her recantation] . . . . She said it was because she was in fear. She was frightened of the defendant. Also we learned what Detective Scarcella testified, it was brought out that she had told him that she was frightened. If you believe that, in fact, she acted because of these threats, then you have to evaluate whether or not firstly the threats were made and if they were made, what is the significance of it?

(Tr. at 501-02.)

Ruling on Hamilton's ineffective assistance of counsel claim in his section 330.30

motion, based on the cross-examination of Scarcella set out above, the court did "not speculate

into the trial strategy of defense counsel," and found that Hamilton received meaningful

representation. (Resp. Ex. E at 13.) I cannot find that this decision was unreasonable. As

detailed above, Smith had made various inconsistent statements prior to trial, claiming at first to

have not witnessed the shooting, later claiming that she saw Hamilton shoot Cash, and still later

recanting that story and claiming that she saw the incident but that Hamilton was not the shooter.

Based on these inconsistencies and contradictions, it was reasonable for defense counsel to

believe that asking Scarcella about prior statements made by Smith would elicit additional

27

inconsistencies, thereby further damaging Smith's credibility and the government's case.[9] Nor was defense counsel ineffective for failing to move to strike Scarcella's responsive answer or for a mistrial; though defense counsel could not have liked Scarcella's response, that fact alone is no basis for striking the testimony or for a mistrial.

In any event, the result of the trial would not have been different in the absence of this testimony by Scarcella. As detailed above, the jury heard evidence from Jewel Smith herself concerning threats, express and implied, made by Hamilton; specifically, threatening phone calls and letters, and the escorting of Smith to Hamilton's lawyer's office by the woman who sat watching throughout Smith's recantation. In light of the above, the state court was not unreasonable in concluding that Hamilton received meaningful representation.

    d.   <u>Alibi Defenses</u>

Hamilton faults his attorney for failing to present the testimony of alibi witnesses, specifically Freeman, Alphonso Dixon, and Hamilton's brother, James Hamilton ("J. Hamilton").[10] The Appellate Division, addressing this contention, held:

> The defendant was not denied the effective assistance of counsel because his attorney failed to call certain witnesses. . . . [T]he defense counsel informed the court that one alibi witness was ill, resided in Connecticut and that "travelling [sic] [to court] would be impossible." The defense counsel further advised the court that another alibi witness was too frightened and had failed to appear in court even though on the previous evening he had agreed to appear. The defense counsel's request for a continuance so he could attempt to persuade this witness to appear was

---

[9]    There is no evidence in the record that defense counsel knew Scarcella's answer to the question before he asked it.

[10]    In the memorandum of law accompanying Hamilton's petition, he only mentions Freeman specifically. But because he refers to "several" witnesses corroborating the alibi, as well as New Haven, Connecticut, I assume that Hamilton also refers to Dixon and J. Hamilton.

> denied. Counsel cannot be considered ineffective because alibi witnesses
> were too ill to come to court to testify or were unwilling to testify.

Hamilton, 708 N.Y.S.2d at 136 (fourth alteration in original).

According to Hamilton, these witnesses would have established that he was at a going-away party in New Haven, Connecticut at the time of the crime. As related by the Appellate Division, defense counsel tried to present the testimony of Freeman and Dixon. Dixon, however, was too ill, and Freeman too frightened. (Tr. at 364-65.) Defense counsel did not want to force Freeman to testify, and his motion for a continuance was denied. (Id. at 366.) Defense counsel's claims were later corroborated by Freeman and Dixon in affidavits attached to Hamilton's first section 440.10 motion (See Resp. Ex. L.), and by Freeman's testimony at the November 19, 1999, hearing arising out of Hamilton's second section 440.10 motion (see Resp. Ex. KK at 170-71.) I will not second-guess defense counsel's decision not to force Freeman to testify, as he could have reasonably believed that a reluctant, hostile witness testifying under duress would have been detrimental to Hamilton's alibi defense. Nor was defense counsel ineffective for failing to call J. Hamilton, who testified at the November 19, 1999, postconviction hearing that he had only seen Hamilton in New Haven during the evening hours of January 4, 1991 (the murder was committed in the morning of January 4). (Id. at 180-81.)

2.    Knowing Use of Perjured Testimony

Hamilton claims that the prosecutor, by presenting the testimony of Smith, knowingly elicited perjured testimony. "A conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Napue v. Illinois, 360 U.S. 264, 269 (1959). The same is true when the government, "although not soliciting false evidence, allows it to go uncorrected when it appears." Id. Under this

29

standard, I must set aside Hamilton's conviction if "the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). The Second Circuit has declined to "draw the contours of the phrase 'should have known.'" Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003). Because the Supreme Court has not clearly established that habeas relief is available in the complete absence of prosecutorial knowledge of perjury, I may not, consistent with § 2254(d)(1), grant relief on this ground. See id. at 345 n.2 (AEDPA overrules Sanders v. Sullivan, 863 F.2d 218 (2d Cir. 1988), which granted habeas relief in the absence of prosecutorial knowledge of perjury).

In his section 330.30 motion, Hamilton claimed that the post-trial recantation by Smith constituted newly discovered evidence. The court wrote:

> Upon observing the witnesses and the defendant during the hearing and trial, the court finds that all the evidence and facts surrounding and supporting the recantation by Jewel Smith to be suspect and unreliable.
> . . . .
> Whether it is the defendant directly or his agents, it is clear that since his arrest there has been constant contact with the only eyewitness, Jewel Smith. It began when someone picked up Jewel and brought her to [defense counsel's] office to recant her testimony and continued with phone conversations, letters and visits. Although Jewel was called by the prosecutor as their witness during the hearing, she had already given a recantation statement to an investigator, whom she said she contacted, but who was hired by the defendant.
> The Jury in this case already judged this eyewitness, Jewel Smith. They were presented with her criminal record, her recantation, and her expression of fear of the defendant. This Jury found Jewel Smith's direct trial testimony to be credible and rejected the recantation.
> Similarly, this Court rejects defendant's "newly discovered evidence" as being contrived and not believable.

(Resp. Ex. E at 15-16.)

Though the prosecutor knew that Smith had recanted prior to trial, she, like the jury, credited Jewel's account in which Hamilton shot Cash. Even if I were to accept Hamilton's assertion that Smith's recantation is the truth, that would not lead to the conclusion that the prosecutor knowingly elicited perjury. This is especially true in light of the fact that Smith recanted twice, and these two recantations were inconsistent with each other.[11] The prosecutor, like the jury, could have reasonably concluded that Smith's testimony that Hamilton was the shooter was true, and that she recanted due to fear of Hamilton. As there is therefore no evidence that the government knowingly elicited perjury, this claim does not justify issuance of the writ.

3. Newly Discovered Evidence

Hamilton claims that the state courts violated due process by failing to vacate his conviction in light of newly discovered evidence. Specifically, Hamilton refers to (1) Douglas's testimony that he witnessed the murder and that Hamilton was not present, (2) Breeden's testimony that, shortly after the murder, Dawson informed him that Dawson had killed Cash and was spreading a rumor that Hamilton was responsible, (3) Smith's recantation, (4) DeLouisa's memobook entry containing Jewel Smith's initial statement, under the alias "Karen Smith," and (5) Freeman's alibi testimony purporting to place Hamilton in New Haven, Connecticut, on the night of the January 4, 1991.[12]

---

[11] In her first recantation, to defense counsel, Smith stated that she saw the incident and Smith was not the shooter. In her testimony at the section 330.30 hearing, however, Smith claimed that she was in a store at the time of the shooting, and saw nothing.

[12] Hamilton does not appear to claim that I should grant the writ based on newly discovered evidence, but rather that the trial court was unreasonable in not overturning his conviction based on this evidence. To the extent that Hamilton is requesting that I grant the writ based on this newly discovered evidence, his request is denied. See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); Townsend v. Sain, 372 U.S. 293, 317 (1963) ("[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for

As to Douglas, the trial court held:[13]

> Douglas has not proven to be a reliable witness. His testimony is filled
> with many inconsistencies and is contradictory to all the reliable evidence.
> He stated first that he told the police the same story at all times. After the
> testimony of his mother, Douglas then claimed he told two stories, one in
> the presence of his mother, the other in her absence. Furthermore,
> Douglas states that he spoke with Detective Scarcella prior to his meeting
> with Scarcella, Ms. Merkin, and Detective White. This is contrary to the
> testimony of all other witnesses . . . . Thus, this Court finds the "newly
> discovered evidence" lacking credibility and insufficient proof that the
> prosecution was in possession of this exculpatory evidence.

(Resp. Ex. R at 4-5.) As to Breeden, the court held:

> The court finds that the testimony of Joseph Ponzi, Dan Saunders,
> and Anne Gutmann was credible. The court finds that the testimony of
> Darren Breeden was incredible because of his demeanor in the answering
> of questions and the inconsistencies in his answers.
>
> CPL 440.10(g) gives the court the power to vacate a judgment
> upon the ground that new evidence has been discovered, which could not
> have been produced by the defendant at the trial, even with due diligence
> on his part, and which is of such character as to create a probability that
> had such evidence been received at the trial, the verdict would have been
> more favorable to the defendant . . . . Since the court has found Mr.
> Breeden's testimony incredible, his allegations do not constitute newly
> discovered evidence.
>
> Also, assuming Mr. Breeden had been credible, Money Will's
> statement that he murdered Nathaniel Cash may be admissible evidence
> only if it is a declaration against penal interest. . . . "To circumvent
> fabrication and insure the reliability of these statements, there must be
> some evidence, independent of the declaration itself, which fairly tends to
> support the facts asserted therein." (People v Settles, 46 NY2d 154, 168).
> Defendant did not present independent evidence at the hearing which may
> tend to support the conclusion that Money Will [Dawson] and Ya-Ya[14]
> murdered Nathaniel Cash.

---

relief on federal habeas corpus.").

[13]     Much of the language quoted throughout this section has been quoted above. I include it again
here only for convenience.

[14]     The record reveals little about who "Ya-Ya" is, other than that, according to Breeden, Dawson
claimed that Ya-Ya was also involved in the murder of Cash. (See Resp. Ex. MM at 8.)

(Resp. Ex. PP at 4-5.) In a later opinion, the court further held that "[t]estimony from Mr. Breeden about Ms. Smith's statement that she did not witness the shooting would merely impeach or contradict her testimony at trial." (Resp. Ex. II at 17.)

As to Smith's posttrial recantation, the court held:

Upon observing the witnesses and the defendant during the hearing and trial, the court finds that all the evidence and facts surrounding and supporting the recantation by Jewel Smith to be suspect and unreliable.

. . . .

Whether it is the defendant directly or his agents, it is clear that since his arrest there has been constant contact with the only eyewitness, Jewel Smith. It began when someone picked up Jewel and brought her to [defense counsel's] office to recant her testimony and continued with phone conversations, letters and visits. Although Jewel was called by the prosecutor as their witness during the hearing, she had already given a recantation statement to an investigator, whom she said she contacted, but who was hired by the defendant.

The Jury in this case already judged this eyewitness, Jewel Smith. They were presented with her criminal record, her recantation, and her expression of fear of the defendant. This Jury found Jewel Smith's direct trial testimony to be credible and rejected the recantation.

Similarly, this Court rejects defendant's "newly discovered evidence" as being contrived and not believable.

(Resp. Ex. E at 15-16.) In a later decision, the court held that the "recantation by Jewel Smith is not newly discovered evidence and would be cumulative because she has recanted her testimony several times, both before and after trial and at the hearing on defendant's motion to set aside the verdict." (Resp. Ex. II at 16.)

As to DeLouis's memobook entry, the Appellate Division held:

The defendant's claim that a detective's notebook was not disclosed to his attorney in a timely manner is belied by the record. The defendant concedes that a *Rosario* packet, which included the detective's notebook, was turned over to his attorney during jury selection. There was no *Rosario* violation since the People furnished the defendant with a copy of the notebook well before the time prescribed by CPL 240.45(1)(a).

The defendant's claim that the People violated their obligation to disclose the existence of exculpatory material is also meritless, since the existence of the claimed exculpatory material was known, or should have been known, to the defendant.

Hamilton, 708 N.Y.S.2d at 136 (citations omitted).

Finally, as to alibis, the Appellate Division wrote:

The defendant was not denied the effective assistance of counsel because his attorney failed to call certain witnesses. At the time of trial, the alleged witnesses were unavailable or unknown to both the defendant and his attorney. Additionally, the defense counsel informed the court that one alibi witness was ill, resided in Connecticut and that "travelling [sic] [to court] would be impossible." The defense counsel further advised the court that another alibi witness was too frightened and had failed to appear in court even though on the previous evening he had agreed to appear. The defense counsel's request for a continuance so he could attempt to persuade this witness to appear was denied. Counsel cannot be considered ineffective because alibi witnesses were too ill to come to court to testify or were unwilling to testify.

Id. And in a later opinion, a lower court found:

The newly discovered evidence must be such as could not have been discovered before trial by the exercise of due diligence. The testimony of Kim Freeman and James Hamilton is not new evidence within the meaning of the statute since they were known to defendant and were listed as witnesses on the alibi notice. They could have been subpoenaed to testify at the trial.

[Hamilton's brother] testified at the hearing that he did not see defendant in the morning on January 4, 1991, the day of the murder. He saw defendant at a party in New Haven, Connecticut in the evening of that day.

Defendant has failed to meet his . . . burden of showing that the proffered evidence was in fact newly discovered, i.e., that it was not discovered until after trial and could not have been discovered before trial with the exercise of due diligence, and is sufficiently probative to likely change the result if a new trial is granted.

(Resp. Ex. PP at 9 (citations omitted).)

Hamilton essentially asserts the same arguments he made to the state courts regarding this newly discovered evidence. The state courts' findings are presumed to be correct, and Hamilton fails to rebut them, let alone with clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). Accordingly, they are rejected.

4.    The Right to Be Present

Hamilton argues that he was denied his constitutional right to be present during material stages of his trial when the trial court ordered a read-back of testimony and delivered a supplemental charge to the jury in his absence. A criminal defendant has the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." Faretta v. California, 422 U.S. 806, 819 n.5 (1975). However, "the right to be present is not absolute: it is triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" Cohen v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934)). "It is beyond dispute that a judge's instructions to a jury constitute an integral part of the trial." United States v. Fontanez, 878 F.2d 33, 35 (1989) (citing Shields v. United States, 273 U.S. 583, 588-89 (1927); United States v. Glick, 463 F.2d 491, 493 (2d Cir. 1972)). Hamilton also had a right to be present during the read-back of the testimony. See id. at 34.

Hamilton, a practicing Muslim, observed the sabbath on Friday, an issue that was discussed prior to trial. The second day of deliberations, however, fell on Friday, July 17, 1992. (Tr. at 473.) After noting that Hamilton was not present, the court questioned whether Hamilton needed to be present for a read-back and clarifying instruction, and discussed cases on either side and various options. (Id. at 473-77.) The court then decided to attempt to contact Hamilton in

jail by phone, so his attorney could explain the problem to him and possibly convince him to come to court. (Id. at 477-78.) At 1:00 p.m. Hamilton still had not called the court, so a lunch recess was taken until 2:00 p.m. (Id. at 480-82.) Around 4:00 p.m., after speaking with his attorney, Hamilton agreed to return to court and transportation was arranged for him to do so. (Id. at 488-89.)[15] As Hamilton was expected to arrive at about 6:20 p.m., the court decided to wait until 6:30 p.m., at which point the jury would be dismissed for dinner and instructed not to speculate as to the delay. (Id. at 491-92.) At this point, the record reads as follows, in pertinent part:

> [DEFENSE]:[16] If [Hamilton's] here at 6:30, are you going to charge them with the note as the note requests?

> THE COURT: No. We'll send them to dinner. If it was just the law, I would charge them before dinner so they could come back but they want testimony. They want the testimony of Jewel Smith from the point that she testified that they called for a taxi cab until the suspects fled. In other words, they want the description of the crime itself as she described it.

> (Whereupon the jury is now entering the courtroom)

> THE COURT: Ladies and gentlemen, I know that you returned from your breakfast this morning somewhere around ten o'clock. I'm fully aware of that but I also know that you wrote me a note . . . . I realize that probably from 11:15 more or less you were unable to continue your deliberations while this was happening wondering why that is. Well, obviously there was a problem which I'm not going to share with you. There was a reason. . . . It's not anybody's fault. I don't want you to, in any way, start speculating why this happened or to infer anything or to put any blame on either of the parties in this matter because that would be wrong

---

[15]  At 4:10 p.m., the court received another note from the jury asking why the previous note had been ignored. (Tr. at 490-91.)

[16]  "[DEFENSE]" refers to Hamilton's attorney, not Hamilton himself.

36

and it's not their fault. If you want to lay fault, you can lay it on me. Even though I'm faultless also, I have big shoulders. There was a problem and I just couldn't bring you in before there was time to resolve the problem but we have now resolved our problem and we're ready to proceed. What I'm going to do is answer the original note.

(Id. at 491-93.) After reading the requested portion of Smith's testimony, the court clarified its instructions on reasonable doubt and credibility, and then sent the jury to dinner. (Id. at 494-509.)

After the jury was excused, the court asked Hamilton's attorney if he had "any exceptions or additions or anything to my charge." Defense counsel objected only to the court's discussion of consciousness of guilt during the clarification of the credibility instruction. (Id. at 509-10.) The jury then sent out a note requesting dinner in the jury room, as well as crime scene photographs. (Id. at 511.) The record continues as follows, in pertinent part:

(Whereupon a dinner recess has been declared following which the proceedings resume)

THE CLERK: The defendant is en route. Counsel for the defendant and the assistant district attorney are present.

THE COURT: We received a note which reads, "Your honor, after serious deliberation of the evidence presented, we are unable to reach a unanimous decision. The weight and burden of our deliberations are at the point of causing severe mental and emotional anguish. We feel that we have explored all available avenues. We have consciously attempted to come to a unanimous decision." Mark this Court's Exhibit 9. I intend to bring the jury in.

(Whereupon the jury is now entering the courtroom)

THE COURT: I have a note from you . . . . Ladies and gentlemen, I direct you to continue your deliberations. Please go back with the court officer.

37

(Whereupon the jury is excused from the courtroom in order to continue deliberations)

THE COURT: Does anyone have anything to say at this time?

[DEFENSE]: I have no applications; no motions.

. . . .

(Whereupon there is a recess period at this point following which the proceedings are being convened again)

THE CLERK: The defendant is present with counsel and the assistant district attorney is also present. The jury is now entering the courtroom.

(Whereupon the jury is coming in with a verdict at 10:45 p.m.)

(Id. at 511-13.) The Appellate Division did not specifically address this claim, but did conclude its opinion by noting that Hamilton's "remaining contentions . . . are either unpreserved for appellate review or are without merit."[17] Hamilton, 708 N.Y.S.2d at 136.

Hamilton has the burden of demonstrating his claim that proceedings occurred in his absence by a preponderance of the evidence. See, e.g., Galarza v. Keane, 252 F.3d 630, 636 n.5 (2d Cir. 2001). He cannot carry that burden here. Though the state court record could certainly be clearer,[18] I conclude from the minutes that Hamilton was in court during the read-

----

[17]   Where a state court uses disjunctive language such as this (i.e., "either . . . or"), "the validity of the claim is preserved and is subject to federal review." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 (2d Cir. 2000).

[18]   The trial court, in discussing various cases dealing with the absence of defendants, stated as to one such case:

> I read the minutes, which didn't assist me in any way, to determine if [the defendant in that case] was present or not, because the clerk, unlike my fine Clerk, didn't say let the record indicate that the defendant is present with his attorney and with Assistant District Attorney and all the jurors are present.
> Then, I would know if the defendant was or was not present. That clerk said nothing, he just said that the jury is coming in, so I wasn't able to determine.

(Tr. at 475.) Ironically, I have a similar problem with the minutes in this case.

38

back and clarification. In any event, given the evidence, I cannot find by a preponderance that Hamilton was not in the courtroom.

Although the record does not state that Hamilton was present when the jury entered the courtroom for the readback of testimony and instructions (see Tr. at 492), the judge told the jury that the considerable delay that day had been due to a "problem" that "we have now resolved . . . and we're ready to proceed." (Id. at 492-93.) The court properly never mentioned that the "problem" was that Hamilton was not present in the courthouse, but it could hardly be clearer to me that the resolution of the problem was Hamilton's presence as the court spoke. (See id. at 492-509.) Moreover, the court did not instruct the jury not to draw an adverse inference based on Hamilton's absence, which it would have done had Hamilton not been present. (See id.) Also telling is the fact that Hamilton's attorney, who had been working with the court throughout the day to secure Hamilton's presence, never objected to Hamilton's absence (see id.), even when the court asked for objections (see id. at 509-10).[19] Further, it defies logic that the same trial judge who waited over five hours to secure Hamilton's presence in the courtroom suddenly—and without comment by himself or anyone present—abandoned his efforts and proceeded in Hamilton's absence despite the fact that Hamilton was expected in a matter of minutes. (Id. at 490-91.) Rather, the inference that Hamilton had indeed been produced in the courtroom before the readback of testimony and jury instructions is very strong. At the very least, Hamilton has failed to carry his burden of proving that he was not in the courtroom during a material stage of the trial, and this claim does not justify issuance of the writ.

---

[19] To be clear, I focus on defense counsel's failure to object not to suggest procedural default, but rather as powerful circumstantial evidence, given counsel's extensive efforts to secure his client's presence, that Hamilton was in the courtroom for these proceedings.

5.    The Unsealing of Pretrial Ex Parte Discussions

Hamilton contends that, by belatedly unsealing the pretrial ex parte discussion between the court and prosecutor, the trial court "thwarted" Hamilton's right to appeal and thereby violated Hamilton's constitutional due process rights. (Pet. at [8].)  Specifically, Hamilton alleges that he was unable to raise a Brady claim regarding Breeden on appeal. As discussed above, however, the transcripts revealed only that Breeden had damaging, not favorable, testimony to provide, and therefore the transcripts would not have supported a Brady claim. To the extent that Breeden actually possessed exculpatory information, Hamilton had an extensive opportunity to explore that information in his section 440.10 motion. Indeed, the court conducted extensive hearings on this claim before denying Hamilton's motion:

> The court finds that the testimony of Joseph Ponzi, Dan Saunders, and Anne Gutmann was credible.  The court finds that the testimony of Darren Breeden was incredible because of his demeanor in the answering of questions and the inconsistencies in his answers.
>
> CPL 440.10(g) gives the court the power to vacate a judgment upon the ground that new evidence has been discovered, which could not have been produced by the defendant at the trial, even with due diligence on his part, and which is of such character as to create a probability that had such evidence been received at the trial, the verdict would have been more favorable to the defendant . . . . Since the court has found Mr. Breeden's testimony incredible, his allegations do not constitute newly discovered evidence.
>
> Also, assuming Mr. Breeden had been credible, Money Will's statement that he murdered Nathaniel Cash may be admissible evidence only if it is a declaration against penal interest. . . . "To circumvent fabrication and insure the reliability of these statements, there must be some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein." (People v Settles, 46 NY2d 154, 168). Defendant did not present independent evidence at the hearing which may tend to support the conclusion that Money Will and Ya-Ya murdered Nathaniel Cash.

(Resp. Ex. PP at 4-5.) In a later opinion, the court further held that "[t]estimony from Mr.

Breeden about Ms. Smith's statement that she did not witness the shooting would merely

impeach or contradict her testimony at trial." (Resp. Ex. II at 17.) Hamilton therefore cannot

now argue that the state courts failed to afford him an opportunity to advance this claim.

6.    The Consciousness of Guilt Charge

Hamilton claims that the trial court's consciousness of guilt charge violated his

right to a fair trial. At the close of the evidence, the court instructed the jury, in pertinent part:

> Another method of credibility that came up at this trial dealt with the
> concept of consciousness of guilt. It was the testimony of Jewel Smith
> that the reason she wrote the letters and the reason that she went to
> [defense counsel's] office to sign [her recantation] . . . . She said it was
> because she was in fear. She was frightened of the defendant.[20] Also we
> learned what Detective Scarcella testified, it was brought out that she had
> told him that she was frightened.[21] If you believe that, in fact, she acted
> because of these threats, then you have to evaluate whether or not firstly
> the threats were made and if they were made, what is the significance of
> it? I'll tell you this right now and it's a rule of law that this type of
> evidence firstly should be examined very carefully because such conduct
> may have an innocent explanation. I'm talking about the conduct of her
> talking about threats if, indeed, they were made. If you find such an
> explanation from the nature of the conduct itself, namely, that it has an
> innocent effect, then you have to disregard it and don't even consider it
> anymore. First you have to decide if it happened to begin with and if it did
> happen, for example, an innocent person out of fear of being incarcerated
> and everything else could make certain overtures or threats if they felt they
> were being falsely accused and if you find that the threats were not

---

[20]    As detailed above, Smith testified about a woman sent by Hamilton to escort Smith to Hamilton's
lawyer's office to recant (Tr. at 233-37), about threatening phone calls and letters from Hamilton (id. at 207-08,
216), and about her belief that Hamilton would have harmed her brothers had she not recanted (id. at 243).

[21]    As set out above, during cross-examination, Scarcella testified as follows, in pertinent part:
[Smith] stated to me that she cannot go to the Grand Jury and testify against Bush,
meaning the defendant, "He will kill me and my whole family. My grandmother found
out that Bush killed Nathaniel [Cash]. She knows him. What he'll do, he'll kill
everyone. My grandmother knows Bush all his life, he's a killer," and she said she was
going to leave New York City.

(Id. at 345.)

something of displaying a consciousness of guilt but that you equivocate it could come from a guilty person, then you have to disregard it and forget it and make believe it's not even in the case. However, if you find that the conduct of the defendant was solely motivated by consciousness of guilt, you may consider and weigh it in your deliberations. However, I instruct you that the proof of conduct evidencing consciousness of guilt is of slight value, slight value. Standing alone such evidence may never, and I repeat, may never be made a basis for the finding of guilt. However, when the People have introduced other direct evidence and substantial evidence pointing towards the guilt of the defendant, then this evidence of threats that engendered fear may be considered by you together with such other direct and substantial evidence of guilt in arriving at your verdict.

(Tr. at 501-03.) The court decided to give this instruction based at least in part on Scarcella's

cross-examination testimony:

THE COURT: I'm going to charge consciousness of guilt, based upon threats. If they believe that she was threatened, that would be a consciousness of guilt charge.

[DEFENSE]: I'm going to object to that.

THE COURT: On what grounds?

[DEFENSE]: There wasn't sufficient information.

THE COURT: You brought out there was up until your cross-examination.

[DEFENSE]: It still wasn't sufficient. It still wasn't sufficient information before this jury to have that particular charge.

THE COURT: It's your opinion. We're dealing in law, not opinions.
     When she just testified to it herself, I wasn't prepared to do it, but then when you fortified it, it was pure hearsay, but you—there was no objection made, and you brought it out.
     When you brought it out from the detective that she complained right up front, that she was threatened, that she was scared, and if they believe her testimony and that of the detective to whom she related it, that this defendant threatened her, that's a proper charge of consciousness of guilt.
     I intend to give it . . . .

42

. . . .

[DEFENSE]:  I don't see any threats that were made, Judge, by Mr. Hamilton. But, if you insist on charging—

THE COURT:  You don't see any threats? She testified that he threatened her.

[DEFENSE]:  She testified what she testified to.

THE COURT:  That's credibility of witnesses. If they don't believe her, that's the end of it.

(Id. at 365-58.)

Scarcella's testimony—which involves Smith's and Smith's grandmother's beliefs about what Hamilton would do to Smith and others should Smith testify, but does not recount threats made by Hamilton—does not justify a consciousness of guilt charge. However, based on Smith's testimony of threatening phone calls and letters, and the woman sent by Hamilton to escort Smith to his attorney's office, the trial court was not unreasonable in concluding that the charge was warranted. Finally, in light of the very limited value assigned to the challenged evidence in the jury charge—i.e., it was of only "slight value" and could "never," by itself, sustain a finding of guilt (id. at 503)—Hamilton cannot establish that the charge adversely affected his case even if it was erroneously given.

43

## CONCLUSION

For the foregoing reasons, the petition is denied. Because Hamilton has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.

So Ordered.

JOHN GLEESON, U.S.D.J.

Dated: January 16, 2004
      Brooklyn, New York